IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>FRANCES M. DIAZ,<br>Defendant. | INFORMATION<br><br>Crim. No. 22 – 085 (FAB)<br><br>Violation:<br><br>18 U.S.C. § 371<br>Plus Forfeiture |



RECEIVED & FILED
CLERK'S OFFICE
MAR - 4 2022
1:00 PM
US DISTRICT COURT
SAN JUAN, PR

## INFORMATION

The United States charges:

### Introduction

1.      The Commonwealth of Puerto Rico's financial sector is comprised of commercial banks, savings and loans associations, securities firms, international banking entities, and other financial institutions. Financial institutions operating in Puerto Rico are subject to both federal and Puerto Rico laws and regulations. The Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF") supervises and regulates the banking system in Puerto Rico. OCIF safeguards the safety and soundness of Puerto Rico's financial sector. OCIF ensures that financial institutions in Puerto Rico comply with numerous laws and dozens of regulations. OCIF conducts examinations to evaluate financial institutions' safety, soundness, and compliance with federal and state regulations. OCIF is led by a Commissioner who oversees all of its operations, including its examinations of Puerto Rico's financial institutions. The Commissioner of OCIF is appointed by the governor of Puerto Rico.

2.      The Bank Secrecy Act ("BSA") and regulations promulgated thereunder were

enacted by Congress to address an increase in money laundering through financial institutions. Among other requirements, the BSA required financial institutions to report suspicious transactions through the filing of Suspicious Activity Reports ("SARs") with the Financial Crimes Enforcement Network of the U.S. Department of Treasury ("FinCEN"), on "any suspicious transaction relevant to a possible violation of law or regulation." FinCEN has overall authority for enforcement of the BSA.

3.      Beginning in 2019 and continuing through 2021, Individual A, the owner of an international bank located in Puerto Rico, along with his co-conspirators, sought to interfere with the functions of both OCIF and FinCEN by bribing public officials they believed had the power to intervene on the bank's behalf. Individual A, Individual B, **FRANCES M. DIAZ** ("**DIAZ**"), and others, conspired to pay tens of thousands of dollars to one or more public officials in Puerto Rico with the intent of influencing them to remove a Commissioner of OCIF, ending OCIF's examination of the international bank, and evading FinCEN's requirement to report suspicious activity.

## Relevant Individuals and Entities

At all times material to this Information:

4.      **FRANCES M. DIAZ** ("**DIAZ**") was the President and Chief Executive Officer of an international bank ("The Bank").

5.      "The Bank" was an international bank, classified as an International Banking Entity ("IBE") under Puerto Rico's International Banking Center Regulatory Act of 1989. The Bank was licensed as an IBE by OCIF. As an IBE, The Bank was only authorized to provide services to customers outside of Puerto Rico, including banks and other financial institutions. IBEs are eligible to open branches in the United States outside of Puerto Rico,

2

and they can be granted access to the Federal Reserve Wire Transfer Network ("Fedwire"), the real-time gross settlement system operated by the Federal Reserve Banks that allows participants to transfer funds electronically between institutions. Fedwire offers two levels of access, offline and online. Transferring funds via the offline access is slower and more expensive than transferring funds via the online access. The Bank was regulated by OCIF and subject to Puerto Rico's laws and to applicable federal laws. The Bank was subject to certain provisions of the BSA, to include the requirement to file SARs. The Bank was wholly-owned by a holding corporation organized in San Juan, Puerto Rico. The holding company was, in turn, wholly owned by a parent corporate entity located in the United Kingdom. The Bank conducted business with corporations from New York, Florida, Panama, the Bahamas, and elsewhere. The Bank was controlled and ultimately owned by Individual A.

6.     Individual A was the ultimate owner of The Bank and the Chairman of its Board of Directors. Individual A had authority and control over The Bank. Individual A was a foreign national and not a citizen of the United States.

7.     Individual B was a political consultant located in Puerto Rico, whose clients included members of the Puerto Rico House of Representatives and Senate, and the Puerto Rico Department of Housing, within and prior to the relevant time period.

8.     Witness 1 was the owner of a Washington, D.C.-based accounting and consulting firm, who also set up independent expenditure-only political action committees. A political action committee is a political committee organized for the purpose of raising and spending money to elect and defeat candidates. An independent expenditure is money spent that 1) expressly advocates the election or defeat of a particular candidate and that 2) is not made in concert or cooperation with the candidate or the candidate's agents. An independent

3

expenditure-only political action committee solely raises money for independent expenditures. In or around May 2020, Witness 1 established an independent expenditure-only political action committee to support the election campaigns of Public Official B ("The PAC"). Witness 1 established the PAC before he began operating at the direction of law enforcement officials. Witness 1 engaged in the other conduct described below at the direction of federal law enforcement authorities.

9.    Public Official A was a public official in the executive branch of the government of Puerto Rico whose official responsibilities included, but were not limited to, overseeing various agencies of the government of Puerto Rico, including selecting, nominating, and appointing heads of such agencies, including OCIF.

10.    Public Official B was an elected public official in the executive branch of the government of Puerto Rico whose official responsibilities included, but were not limited to, overseeing various agencies of the government of Puerto Rico, including selecting, nominating, and appointing heads of such agencies, including OCIF.

### The OCIF Examination of The Bank

11.    In or around July 2019, the Commissioner of OCIF initiated an examination of The Bank. The examination concluded on or around September 18, 2020. The examination identified numerous areas at The Bank that OCIF determined required corrective action. Among other things, as part of the examination OCIF identified dozens of financial transactions The Bank conducted on behalf of its customers that OCIF deemed suspicious and that The Bank did not report as required by the BSA. Several of these financial transactions involved bank accounts and entities owned or controlled by The Bank's ultimate owner, Individual A. Individual A, **DIAZ**, and The Bank were aware that The Bank was

4

obligated under the BSA to report suspicious financial transactions by filing SARs.

12.     A negative examination by OCIF could have had consequences for the Bank, including requiring the Bank to take corrective action, subjecting the Bank to an enforcement action by OCIF that could include financial penalties, negatively impacting the Bank's ability to maintain its offline access to Fedwire or receive online access to Fedwire, and potentially resulting in the loss of the Bank's license to operate as an IBE.

## COUNT 1
### Conspiracy; Federal Funds Bribery and Kickbacks; Bank Secrecy Act
### 18 U.S.C. § 371

13.     The preceding paragraphs of this Information are hereby re-alleged and incorporated in this Count.

14.     In each of the calendar years 2019, 2020, and 2021, the Commonwealth of Puerto Rico was a territory which received more than $10,000 in benefits from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

15.     From in or around December 2019 through in or around August 2021 ("the relevant time period"), **DIAZ** did knowingly and willfully conspire and agree with Individual A, Individual B, and others known and unknown to the United States, to commit offenses against the United States, including:

   a) to corruptly give, offer, and agree to give things of value to one or more public officials of the Commonwealth of Puerto Rico, a territory which during each relevant one-year period received federal benefits in excess of $10,000, with the intent of influencing and rewarding the same public official(s) in connection with any business, transaction, and series of transactions of the commonwealth territory of Puerto Rico valued at $5,000

5

or more, in violation of 18 U.S.C. § 666(a)(2); and

b) to willfully violate the Bank Secrecy Act, specifically, 31 U.S.C. §§ 5318 and 5322, and regulations issued thereunder, namely 31 C.F.R. § 1020.320, by not filing with the United States Department of Treasury required reports of suspicious activity, in violation of 31 U.S.C. §§ 5318(g); 5322; and 31 C.F.R. § 1020.320.

### Purpose of the Conspiracy

16.    The purposes of the conspiracy included, but were not limited to, the following:

    a.  For Individual A and others, known and unknown to the United States, to offer bribes in the form of things of value, including payments to a political action committee that would support Public Official A's election and payments to political consultants who would support Public Official A's election, in exchange for Public Official A terminating a Commissioner of OCIF and appointing a new Commissioner of Individual A's choosing.

    b.  For Individual A, Individual B, DIAZ, and others, known and unknown to the United States, to offer bribes in the form of things of value, including payments to The PAC to support Public Official B's election, intending that the bribes be in exchange for Public Official B directing and exerting influence on public officials to resolve the OCIF examination of the Bank, on terms favorable to The Bank.

    c.  For Individual A, DIAZ, and others, known and unknown, to enrich themselves by corruptly obtaining favorable treatment by OCIF, including the resolution of the OCIF examination of the Bank on terms favorable to the Bank and the determination that The Bank was not required to file Suspicious

Activity Reports, in accordance with the BSA, on certain transactions related to bank accounts and entities owned or controlled by Individual A.

## Manner and Means of the Conspiracy

### Bribery of Public Official A

17.    Between approximately December 2019 and approximately June 2020, Individual A and his co-conspirators gave, offered, and promised things of value to Public Official A, including payments to a political action committee that would support Public Official A's election and payments to political consultants who would support Public Official A's election, in exchange for Public Official A influencing the administration and functioning of OCIF, to include terminating the Commissioner of OCIF and appointing a new Commissioner of Individual A's choosing.

18.    Between approximately December 2019 and June 2020, Individual A and his co-conspirators met with Public Official A in the District of Puerto Rico and elsewhere to discuss Individual A's request to remove the Commissioner of OCIF and appoint a new Commissioner in exchange for Individual A's monetary payments.

19.    Individual A and his co-conspirators communicated with each other directly and through intermediaries via text message, email, and internet-based messaging applications to discuss aspects of the agreement to pay bribes for Public Official A.

20.    Individual A and others paid for political consulting services to benefit Public Official A's election campaign.

21.    Individual A and others concealed the illegal and corrupt purpose of the bribes paid for Public Official A by funneling the payments through bank accounts held by third parties.

22. On or around March 6, 2020, Public Official A directed that the Commissioner of OCIF, who oversaw the examination of The Bank, be terminated. On or around May 14, 2020, Public Official A appointed the person preferred by Individual A as the new Commissioner of OCIF.

<u>Bribery to Influence OCIF Examination</u>

23. Between approximately November 2020 and approximately August 2021, Individual A and his co-conspirators, including Individual B and **DIAZ**, gave, offered, and promised things of value intended for Public Official B, including payments to The PAC, through Witness 1, who represented himself as an intermediary of Public Official B, in exchange for Public Official B directing and exerting influence on public officials to resolve OCIF's examination of The Bank in a manner favorable to The Bank. In truth, Witness 1 was operating at the direction of law enforcement officials, was not actually serving as an intermediary of, or acting on behalf of, Public Official B, and made statements to Individual B and **DIAZ** to further the undercover investigation.

24. Additionally, Individual A, Individual B, and **DIAZ** sought to have Public Official B direct and exert influence on other public officials to ensure that The Bank would not have to enter into an agreement with OCIF acknowledging violations of the BSA, and that The Bank would not have to file Suspicious Activity Reports for certain transactions related to bank accounts and entities owned or controlled by Individual A.

25. Individual A, Individual B, **DIAZ**, and others met with purported associates of Public Official B, including Witness 1, in the District of Puerto Rico. During this meeting they discussed Individual A's specific requests regarding the resolution of OCIF's examination of The Bank in exchange for Individual A's contributions to a political action

committee benefitting Public Official B.

26.    Individual A, Individual B, **DIAZ**, and others communicated with each other directly and through intermediaries via text message, email, and internet-based messaging applications to discuss aspects of the agreement to pay bribes to influence the OCIF examination.

27.    Individual A, Individual B, **DIAZ**, and others attempted to disguise their bribe payments to influence the OCIF examination as contributions to The PAC in order to conceal the illegal and corrupt purpose of the payments.

**Acts in Furtherance of the Conspiracy**

The Meeting at The Bank

28.    On or about April 30, 2021, **DIAZ** and Individual B met with Witness 1, who they understood to be a fundraiser for Public Official B, along with several other interested persons, at The Bank's office in San Juan, Puerto Rico to discuss OCIF's examination of The Bank. During the April 30, 2021 meeting, **DIAZ** communicated to Witness 1 the four objectives that The Bank wished to accomplish: 1) that The Bank would not need to sign a Memorandum of Understanding with OCIF regarding The Bank's deficiencies; 2) that The Bank would not need to file SARs for certain transactions involving bank accounts and entities owned or controlled by Individual A; 3) that OCIF's examination of The Bank would end; and 4) that certain employees of OCIF would be removed from their positions.

29.    On or about May 12, 2021, Individual B sent Witness 1 a text message asking if Witness 1 had been able to discuss the matter with "the boss," referring to Public Official B. To further the undercover investigation, Witness 1 responded that he had, and that he would follow up with Public Official B regarding the timeline for accomplishing three of The

9

Bank's four objectives. In the same conversation, Witness 1 reminded Individual B "to give me a hand with the contribution." Federal law enforcement authorities did not instruct Witness 1 to communicate The Bank's four objectives to Public Official B.

### The Meeting in Guaynabo

30.    Between May 18 and May 24, 2021, **DIAZ** and Witness 1 exchanged iMessages for the purpose of setting up another in-person meeting to discuss The Bank's requests to influence the OCIF examination. On or about May 27, 2021, **DIAZ** and Individual B met with Witness 1 at a restaurant in Guaynabo, Puerto Rico, to discuss The Bank's requests to influence the OCIF examination. During the May 27, 2021 meeting, Witness 1 discussed an agreement with **DIAZ** and Individual B for a $50,000 payment to benefit Public Official B, intending that the payment be in exchange for Public Official B directing and exerting influence on public officials to cause the four objectives that The Bank wished to accomplish: 1) that The Bank would not need to sign a Memorandum of Understanding with OCIF regarding The Bank's deficiencies; 2) that The Bank would not need to file SARs for certain transactions involving bank accounts and entities owned or controlled by Individual A; 3) that OCIF's examination of The Bank would end; and 4) that certain employees of OCIF would be removed from their positions.

31.    During the May 27, 2021 meeting, Witness 1 stated that Individual A, Individual B, and **DIAZ** should let Witness 1 know when they were ready to make a payment to The PAC. To further the undercover investigation, Witness 1 represented that at that point, Public Official B could move forward with The Bank's requests with respect to OCIF. **DIAZ** responded, "We are already there."

32.    At the May 27, 2021 meeting, in response to Witness 1's request for an

10

assurance that Individual A was aware of the agreement, **DIAZ** responded that Individual A was knowledgeable about the discussions and "clear on what the requests are."

33.     During the May 27, 2021 meeting, Witness 1 stated that what they were discussing "cannot leave this table," and Individual B responded by acknowledging the need for secrecy, stating that it would not be convenient for The Bank if it was known "that [Public Official B's office] is intervening in any way."

34.     At the May 27, 2021 meeting, Witness 1 told **DIAZ** and Individual B that he would send them instructions for wiring the money that The Bank was pledging for Public Official B. **DIAZ** told Witness 1 to send the information only to Individual B. When Witness 1 indicated that he did not like to talk or text about "this" on the phone, **DIAZ** stated, "Exactly. One never knows who might be listening."

<u>The Wiring of the Bribe Payment</u>

35.     On or about May 28, 2021, Witness 1 sent Individual B via text message the wiring instructions for the account into which The Bank's monetary payment to benefit Public Official B should be deposited.

36.     In or around May or June 2021, **DIAZ** informed Individual A of Witness 1's representation that in exchange for Individual A's $50,000 payment to The PAC, Public Official B would ensure that 1) The Bank would not need to sign a Memorandum of Understanding with OCIF; 2) The Bank would not need to file SARs for certain transactions related to bank accounts and entities owned or controlled by Individual A; 3) OCIF's examination of The Bank would be resolved on terms favorable to The Bank.

37.     In or around July 2021, Individual A, the owner of The Bank, agreed to make a $25,000 payment to The PAC.

11

38.    In a text message to **DIAZ**, Individual A also suggested that he would authorize the remaining $25,000 of the $50,000 payment to The PAC only after Public Official B delivered on The Bank's requests.

39.    On or around August 11, 2021, Individual A caused a $25,000 wire to be sent to The PAC from a bank account held by The Bank's holding corporation.

All in violation of 18 U.S.C. § 371.

### FORFEITURE ALLEGATION
28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C)

40.    The preceding paragraphs of this Information are hereby re-alleged and incorporated in this Allegation.

41.    Pursuant to 28 U.S.C. § 2461(c) and 18 U.S.C. § 981(a)(1)(C), the United States gives notice to the defendant **FRANCES M. DIAZ** that in the event of a conviction for the offense charged in Count One of this Information, all property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from such offense, is subject to forfeiture.

### Money Judgment

42.    Defendant is notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture.

### Substitute Assets

43.    Defendant is notified that if property subject to forfeiture, as a result of any act or omission of Defendant,

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

12

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property that cannot be divided without difficulty,

the United States will seek to forfeit any other property of Defendant up to the total value of the property subject to forfeiture pursuant to 21 U.S.C. § 853(p), as incorporated by reference in 28U.S.C. § 2461(c) and 18 U.S.C. § 982(b)(1).


W. STEPHEN MULDROW
United States Attorney

SETH A. ERBE
Chief, Financial Fraud and Public
Corruption Section



By: _____

Nicholas Cannon
Assistant United States Attorney


COREY AMUNDSON
Chief, Public Integrity Section

JOHN D. KELLER
Principal Deputy Chief, Public
Integrity Section



By: _____

Ryan R. Crosswell
Trial Attorney


By: _____

Erica O. Waymack
Trial Attorney